T.C. Memo. 1995-593


UNITED STATES TAX COURT


DAVID RENDEL AND RACHEL RENDEL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11878-93.      Filed December 14, 1995.


<u>David M. Kirsch</u>, for petitioners.

<u>Allan D. Hill</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


SWIFT, <u>Judge</u>:  Respondent determined a deficiency in petitioners' 1983 Federal income tax and additions to tax for fraud and for a substantial underpayment of tax as follows:

| | Additions to Tax | | |
|---|---|---|---|
| Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| $49,846 | $24,923 | * | $12,462 |

    * 50 percent of interest due on portion of underpayment attributable to fraud.

All section references are to the Internal Revenue Code in effect for 1983, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioners assert that offshore trusts that they established in 1982 constituted sham trusts that lacked economic substance and that should be disregarded for Federal income tax purposes. Petitioners and respondent, however, disagree on the year in which funds relating to such trusts should be taxable to petitioners.

The issues for decision are: (1) Whether the funds in question should be treated as taxable to petitioners under the constructive receipt doctrine in 1982 -- a year not before the Court -- or as taxable to petitioners in 1983 -- the year in which petitioners actually received and used the funds; and (2) whether petitioners filed a fraudulent 1983 joint Federal income tax return, but for which the period of limitations on assessment against petitioners for 1983 is barred.

FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time the petition was filed, petitioners resided in Alameda, California.

In 1980, petitioners formed Columbia Cosmetics Manufacturing, Inc. (CCMI), as a California corporation to market and distribute cosmetics. CCMI was formed and operated as a subchapter C corporation. Petitioners were the sole shareholders and officers of CCMI. Petitioner David Rendel (David) was president, and petitioner Rachel Rendel (Rachel) was vice president of CCMI. The offices and principal place of business of CCMI were located in San Leandro, California.

Petitioners' books and records were maintained on the cash method of accounting. CCMI's books and records were maintained on the accrual method of accounting. Both sets of books and records were maintained by Crudup C. Howard (Howard), an accountant petitioners hired for that purpose. Howard met monthly with Rachel to reconcile CCMI's bank statements and to discuss with Rachel the accounting for various transactions.

By late 1981, CCMI was earning a significant profit. In late 1981, Howard and petitioners consulted with a number of tax shelter promoters (namely, Gil Armstrong (Armstrong) who was a representative of the American Law Association (ALA),[1] John Green (Green), and Michael Panatelli (Panatelli)). These individuals

---

[1] The ALA was founded by Karl Dahlstrom for the purpose of promoting offshore trusts.

advised Howard and petitioners regarding the purported tax benefits of offshore trusts.

In 1982, with the assistance of Howard, Armstrong, and Green, petitioners established an ALA-type of offshore trust program. Five sham trusts were established and domiciled in Grand Turk, the capital of the Turks and Caicos Islands, located in the British West Indies, under the names of five shell companies (namely, DCH Management (DCH), Ledner Consulting Co. (Ledner), DARA Co. (DARA), Cosmos Investment Co. (Cosmos), and Alpha Associates (Alpha)).

Bank accounts were then opened in California, one account each under the name of four of the five trusts. Howard was a trustee and an agent for Alpha, and Howard held signatory authority over the DCH, Ledner, DARA, and Cosmos bank accounts.

An interest-bearing investment account was also maintained in California under Alpha's name with the Capital Preservation Fund of the First Interstate Bank of California (the Alpha account). The Alpha account was maintained under CCMI's corporate identification number. Rachel held signatory authority over the Alpha account.

Pursuant to petitioners' offshore trust program, funds transferred into the trusts represented profits realized by CCMI.

During 1982 and 1983, $174,308 in profits of CCMI was transferred from CCMI through the offshore trusts and ultimately to the Alpha account. With Howard's participation, the profits

transferred out of CCMI and into the offshore trusts were incorrectly recorded on CCMI's books and records as payroll expenses.

The schedule below describes the transfers that occurred between January 10, 1982, and February 2, 1983, of CCMI's profits from CCMI to and among the offshore trusts and into the Alpha account:

| Amount | Date Transferred From CCMI | Transferred Through Trusts | Date Deposited Into Alpha Acct. |
|---|---|---|---|
| $ 35,500 | 1/10/82 | DCH-DARA-Cosmos | 2/23/82 |
| 23,350 | 3/15/82 | DCH-DARA-Cosmos | 3/31/82 |
| 26,650 | 3/22/82 | Ledner-DCH-DARA-Cosmos | 4/14/82 |
| 27,696 | 5/12/82 | DCH-DARA-Cosmos | 5/26/82 |
| 35,699 | 9/8/82 | DCH-DARA-Cosmos | 9/20/82 |
| 9,115 | 11/23/82 | DCH-DARA-Cosmos | 12/7/82 |
| 16,298 | 12/29/82 | DCH-DARA-Cosmos | 2/2/83 |
| $174,308 | | | |

In 1983, certain additional transfers occurred of the same profits or funds of CCMI that had been transferred out of CCMI in 1982 and into the offshore trust bank accounts. In particular, on June 9, 1983, $135,000 was transferred out of the Alpha account and back into CCMI's bank account. Between June 11, 1983, and June 17, 1983, this same $135,000 was transferred yet again from CCMI through the above offshore trusts and back into the Alpha account.

On June 24, 1983, $184,630 was withdrawn from the Alpha account[2] by the purchase of a cashier's check and was used by petitioners as part payment on the purchase of a new personal residence for petitioners in Alameda, California (referred to hereinafter as the Oyster Pond Property). An installment note from petitioners to Alpha with respect to this $184,630 was drafted but was never signed by petitioners, and petitioners made no repayments to Alpha of this $184,630. Alpha did receive a deed of trust on the Oyster Pond Property as stated security relating to this $184,630. Petitioners have implicitly conceded that petitioners' withdrawal of this $184,630 did not constitute a valid loan from Alpha.

In August and September of 1983, petitioners purchased appliances and other items for the Oyster Pond Property using $3,148 in CCMI's funds. The schedule below describes these purchases:

| Date | Item | Cost |
|------|------|------|
| 8/11/83 | Home appliances | $2,051 |
| 8/31/83 | Wallpaper | 800 |
| 9/8/83 | Other expenses | 297 |
| | | $3,148 |

On November 8, 1982, this Court decided Zmuda v. Commissioner, 79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir.

---

[2]    This amount includes accrued interest and appears to have been the entire balance of the Alpha account at the time of withdrawal.

1984).  In the Zmuda case, we held that certain offshore trust programs similar to those established by petitioners herein constituted shams, lacked economic substance, and were to be disregarded for Federal income tax purposes.

The $174,308 in profits from CCMI that in 1982 was transferred out of CCMI and through the above offshore trusts into the Alpha account was not reported on petitioners' 1982 Federal income tax return.

Howard alleges that in August of 1983 he first learned that this Court had decided Zmuda v. Commissioner, supra, under the authority of which the $174,308 transferred in 1982 out of CCMI, through the offshore trusts, and into the Alpha account arguably should be treated as taxable income to petitioners in 1982.  On August 24, 1983, Howard conveyed the information about Zmuda and its ramifications to petitioners.

On August 31, 1983, Howard, on behalf of petitioners, "discontinued" the DCH, Ledner, DARA, Cosmos, and Alpha trusts and closed the accounts of Ledner, DARA, and Cosmos.  The record does not reflect whether or when the bank accounts of DCH and Alpha were closed.

Also in August or early September of 1983, Howard prepared for petitioners a proposed amended joint 1982 Federal income tax return (proposed amended 1982 return).  On this proposed amended 1982 return, the $174,308 in profits of CCMI that had been

transferred in 1982 into the offshore trusts was reflected as taxable income to petitioners.

On September 14, 1983, Howard gave petitioners the proposed amended 1982 return. Petitioners, however, refused to sign the proposed amended 1982 return, and Rachel tore it in two, stating, "We'll wait until * * * [respondent] catches us."

On petitioners' 1983 joint Federal income tax return that was timely filed with respondent, neither the $174,308 transferred out of CCMI through the offshore trusts and into the Alpha account, nor the $184,630 withdrawn in 1983 from the Alpha account and used by petitioners to purchase the Oyster Pond Property was reported as income by petitioners. On petitioners' 1983 Federal income tax return, petitioners did report as miscellaneous income $21,058 relating to their personal use of CCMI funds. This amount was not otherwise described.

On CCMI's 1983 Federal corporate income tax return, $3,158 in interest income earned on the Alpha account in 1983 was reported as interest income.

On November 24, 1984, Howard, as trustee for Alpha, and without consideration, signed a reconveyance deed transferring Alpha's purported security interest in the Oyster Pond Property from Alpha to petitioners.

On April 10, 1991, a Federal Grand Jury indicted petitioners for conspiracy to defraud the United States during 1981 through 1986 with regard to petitioners' joint individual and CCMI's

corporate Federal income taxes and for tax evasion for 1984 and 1985 with regard both to petitioners' joint individual and CCMI's corporate Federal income taxes.

On August 5, 1992, respondent determined deficiencies in and additions to petitioners' joint Federal income taxes and CCMI's corporate Federal income taxes for 1984 and 1985 in the total amount of $299,908.  The tax deficiencies and additions to tax determined by respondent against petitioners for 1984 and 1985 bore no specific relationship to the offshore trust tax shelter scheme at issue in this case but did relate to petitioners' diversion of CCMI funds for their personal benefit in 1984 and 1985 through other schemes.

On October 17, 1991, petitioners paid to respondent the total of $299,908 in Federal income tax deficiencies determined against petitioners and CCMI for 1984 and 1985.

On October 22, 1991, petitioners each pleaded guilty to one count of tax evasion for 1984.  The Government dropped the remaining counts of the above criminal indictment.

On March 16, 1993, respondent mailed to petitioners the notice of deficiency for 1983 that is at issue in this case, in which respondent determined that petitioners received in 1983, not in 1982, unreported distributions from CCMI of $191,278[3] as a

---

[3]     Respondent computed the $191,278 in distributions based on the $184,630 withdrawn in 1983 from the Alpha account to purchase the Oyster Pond Property, plus the $3,148 in furnishings paid
                                                        (continued...)

result of petitioners' use in 1983 of the profits of CCMI for personal purposes (namely, to purchase and improve the Oyster Pond Property), and respondent determined that, as a result of petitioners' alleged fraudulent failure to report such distributions on their 1983 joint Federal income tax return, the period of limitations on assessment was still open.

OPINION

1983 Constructive Dividends

Numerous court opinions establish that if shareholders of a corporation receive distributions of corporate funds or other corporate property for their personal use or benefit, the distributions from the corporation may be taxed to the shareholders as constructive dividends to the extent of the corporation's earnings and profits. Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Commissioner v. Riss, 374 F.2d 161, 166-167 (8th Cir. 1967), affg. in part, revg. in part, and dismissing in part T.C. Memo. 1964-190; Melvin v. Commissioner, 88 T.C. 63 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962); American Properties, Inc.

---

[3](...continued)
with CCMI funds, plus $3,500 in allegedly omitted commission income paid by CCMI to David. Respondent now concedes that the $3,500 treated as commission income represents a nontaxable repayment by CCMI of a loan CCMI had received from David.

v. Commissioner, 28 T.C. 1100, 1115 (1957), affd. 262 F.2d 150 (9th Cir. 1958).

In Zmuda v. Commissioner, supra, and in the decisions that followed,[4] the courts held that funds received by certain offshore trusts were taxable in the year of receipt to the taxpayers who controlled the trusts.

Petitioners herein argue that the offshore trust program in which they participated is not distinguishable from the offshore trust program that in Zmuda v. Commissioner, supra, was held to constitute a sham and that was disregarded for Federal income tax purposes. Petitioners then argue that, in light of the holdings in Zmuda and its progeny, and under the claim of right doctrine, the profits or funds of CCMI that, at the end of 1982, were transferred into the offshore trusts should be treated as constructively received by petitioners in 1982, not in 1983. Petitioners, in other words, contend that respondent has chosen

---

[4]    See Sandvall v. Commissioner, 898 F.2d 455 (5th Cir. 1990), affg. on consolidated appeal T.C. Memo. 1989-56 and T.C. Memo. 1989-189; Akland v. Commissioner, 767 F.2d 618 (9th Cir. 1985), affg. T.C. Memo. 1983-249; Professional Serv. v. Commissioner, 79 T.C. 888 (1982); Spencer v. Commissioner, T.C. Memo. 1994-531; Dahlstrom v. Commissioner, T.C. Memo. 1991-265, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993); Dahlstrom v. Commissioner, T.C. Memo. 1991-264, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993); Able Co. v. Commissioner, T.C. Memo. 1990-500; Denali Dental Serv. v. Commissioner, T.C. Memo. 1989-482; Pauli v. Commissioner, T.C. Memo. 1989-481; Melvin L. Cochran, D.D.S., Inc. v. Commissioner, T.C. Memo. 1989-102.

the wrong year in which to tax petitioners on the $174,308 withdrawn from CCMI and deposited into the offshore trusts.

Respondent argues that the $184,630 that in June of 1983 petitioners withdrew from the Alpha account and used to purchase the Oyster Pond Property should be treated as a constructive dividend taxable to petitioners in 1983.

We agree with respondent. In the instant case, during 1982 and early 1983, sufficient control over the offshore trust bank accounts was maintained and exercised on behalf of CCMI so that the funds transferred by CCMI in 1982 through the trusts and into the Alpha account are to be treated as properly taxable to petitioners in 1983, the year in which CCMI's funds were first used by petitioners for petitioners' personal benefit.

During June of 1983, before petitioners withdrew the $184,630 from the Alpha account, $135,000 of the funds in that account was transferred to CCMI, and then from CCMI through the offshore trusts, back to the Alpha account. Interest of $3,158 that was earned on the Alpha account in 1983 was reported on CCMI's 1983 corporate Federal income tax return. From the inception of the Alpha account, CCMI's taxpayer identification number was used for the Alpha account. Lastly, petitioners made no personal use of the funds in the Alpha account until June 24, 1983, when $184,630 was withdrawn from the account for purchase by petitioners of the Oyster Pond Property.

We conclude that the $184,630 first withdrawn on June 24, 1983, from the Alpha account for petitioners' personal use and benefit, is properly treated as constructive dividend income taxable to petitioners in 1983.

In light of the fact that petitioners did report on their 1983 joint Federal income tax return $21,078 relating to their personal use of CCMI funds, we conclude, however, that petitioners are not taxable on the $3,148 relating to the items purchased for the Oyster Pond Property.

Fraud Addition to Tax

Respondent has the burden of establishing fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  Respondent must prove both that an underpayment in tax exists and that a portion of the underpayment was due to fraud. Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. T.C. Memo. 1987-265; Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), affg. T.C. Memo. 1986-223; King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 515 (1992); Wenz v. Commissioner, T.C. Memo. 1995-277.

Respondent has shown that the $184,630 withdrawn from the Alpha account is taxable to petitioners for 1983 and that the tax reflected on petitioners' 1983 Federal income tax return was therefore understated.

Fraudulent intent consists of an intentional wrongdoing for the purpose of avoiding the payment of taxes known to be owed. Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Fraud may be inferred from certain "badges of fraud," such as understatements of income, inadequate records, the failure to file tax returns, the concealment of assets, implausible or inconsistent behavior, and the failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

Because fraud can rarely be proved by direct evidence, fraud is often established by circumstantial evidence. Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d at 307; Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), affg. T.C. Memo. 1983-249. Consistent and substantial understatements of income may constitute evidence of fraud. Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980); Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172.

Fraud determinations against taxpayers who have participated in sham offshore trust programs similar to that in which petitioners participated generally have been sustained. See Akland v. Commissioner, supra; Professional Serv. v. Commissioner, 79 T.C. 888, 930-931 (1982); Dahlstrom v.

Commissioner, T.C. Memo. 1991-265, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993); Dahlstrom v. Commissioner, T.C. Memo. 1991-264, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993); Able Co. v. Commissioner, T.C. Memo. 1990-500.  But see Spencer v. Commissioner, T.C. Memo. 1994-531; Denali Dental Serv. v. Commissioner, T.C. Memo. 1989-482; Pauli v. Commissioner, T.C. Memo. 1989-481.

Petitioners, citing United States v. Claiborne, 765 F.2d 784, 798 (9th Cir. 1985), argue that they did not have the requisite fraudulent intent to conceal their income because they in good faith relied on the advice of Howard, Armstrong, Green, and Panatelli to the effect that their offshore trust program was a legitimate tax shelter.

We disagree.  Petitioners falsely reflected the withdrawals from CCMI and the deposits to the trust bank accounts as payroll expenses of CCMI.  Petitioners attempted to conceal the $184,630 they used to purchase the Oyster Pond Property through a sham loan transaction.  Petitioners participated in a pattern of fraudulent underreporting of income in 1984 and 1985 that we believe began in 1983, if not earlier.  We conclude that the underpayment of petitioners' income tax for 1983 resulting from their participation in the sham offshore trust program was due to fraud.  See Akland v. Commissioner, supra at 622; Dahlstrom v. Commissioner, T.C. Memo. 1991-264.

We also sustain respondent's determination under section 6661, which provides for an addition to tax where the taxpayer makes a substantial understatement of income tax liability.  A "substantial understatement" is described as an understatement that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6661(b)(1)(A).  The evidence establishes that petitioners' tax liability falls within these parameters, and we sustain respondent's determination on this issue.[5]

Decision will be entered

under Rule 155.

---

[5]     Petitioners, for the first time in their reply brief, raise a new issue as to whether CCMI in 1983 had sufficient earnings and profits to support the taxability of the $184,630 in constructive distributions from CCMI that we have concluded petitioners received in 1983.  This issue is untimely raised by petitioners.  It would now be prejudicial to respondent to allow this new issue to be raised, and we treat this issue as waived. See Seligman v. Commissioner, 84 T.C. 191, 198 (1985), affd. on other grounds 796 F.2d 116 (5th Cir. 1986); Graham v. Commissioner, 79 T.C. 415, 423-424 (1982).  Nevertheless, we have examined the record and find nothing to support petitioners' argument as to the lack of earnings and profits.  To the contrary, Howard's uncontroverted testimony indicates that the offshore trusts were funded with net profits of CCMI.